UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,,

    Plaintiff,

v.                                    Case No. 08-CR-254

JUSTIN KIECKBUSCH,

    Defendant.

**RECOMMENDATION RE: DEFENDANT'S MOTION TO SUPPRESS**

### I. PROCEDURAL BACKGROUND

On September 23, 2008, a grand jury sitting in the Eastern District of Wisconsin returned a two-count indictment against defendant Justin Kieckbusch ("Kieckbusch"). Count One charges Kieckbusch with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count Two charges Kieckbusch with possession of a firearm which was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d) and 5871. Both counts stem from Kieckbusch's alleged possession of a firearm, to wit, a bore shotgun, on August 10, 2008. Kieckbusch has entered a plea of not guilty to all counts. His trial is currently scheduled to commence on January 20, 2009, before United States District Judge Lynn Adelman.

On November 13, 2008, in accordance with the pretrial scheduling order previously issued by the court, the defendant filed a motion to suppress and requested an evidentiary hearing. An evidentiary hearing was held on December 2, 2008, at which time Milwaukee Police Officers Todd Bohler and Andrew Bell each testified. The defendant, Kieckbusch, also testified at the hearing. The

parties filed briefs in support of their respective positions in accordance with the briefing schedule set by the court. Accordingly, the defendant's motion is now fully briefed and is ready for resolution.

## II. FACTUAL BACKGROUND

On the morning of August 10, 2008, Milwaukee police officers Todd Bohlen, Andrew Bell, and Juan Duran were informed at police roll call that two Latin King gang members had been shot the night before in the area around 15th and Becher Streets. Because gang activity and tensions were high in the area around 15th and Becher Streets, the three officers, all in uniform, were assigned to an unmarked squad car as part of an effort to "saturate" the area in an attempt to reduce the violence. (Gov't's Br. at 2; Def.'s Br. at 1-2.)

Officer Bohlen has sixteen years of experience as a police officer and is currently assigned to the Neighborhood Task force. In his past work as a Milwaukee police officer, Officer Bohlen spent a number of years on the south side of Milwaukee as part of the gang squad. By contrast, Officer Bell testified that he has had more experience with north-side Milwaukee gangs. As a result, Officer Bohlen was the informal leader of the three officers. (Gov't's Br. at 2.)

Around 11:05 a.m., the three officers were patrolling the area around 15th and Becher. Officer Bohlen was driving with Officer Bell in the front passenger seat and Officer Duran in the rear passenger seat. While the officers were traveling westbound on Becher, in the 1400 block, they observed Kieckbusch's car, a two-door 1998 Pontiac Sunfire, traveling northbound on 15th Street. As Kieckbusch's vehicle approached the intersection of 15th and Becher, Kieckbusch drove his car, which was speeding, through a stop-sign and made a fast, hard right turn onto Becher in front of the officers' squad car. While Kieckbusch's car was crossing onto Becher from 15th Street, it veered into the oncoming lane of traffic, forcing Officer Bohlen to maneuver his vehicle around

2

Kieckbusch's vehicle to avoid an accident. Kieckbusch testified that he recognized Bohlen's unmarked vehicle as a police car as he made the turn onto Becher from 15th Street. (Gov't's Br. at 2.)

Officer Bohlen then made a U-turn and proceeded eastbound on Becher in pursuit of Kiechbusch. When Kieckbusch's car, which was still traveling eastbound on Becher, reached the intersection of 14th and Becher, Kieckbusch again drove the car through a stop sign and turned the vehicle southbound onto 14th Street. At this point, Officer Bohlen initiated his vehicle's lights and siren and accelerated his vehicle up to approximately sixty miles an hour to catch up to Kieckbusch's vehicle as it traveled southbound on 14th Street. After Officer Bohlen initiated his vehicle's lights and sirens, Kieckbusch drove his vehicle over to the side of the street. Kieckbusch had traveled approximately one block southbound on 14th Street before stopping his vehicle. After Kiekbusch stopped his vehicle, Officer Bohlen then stopped his squad car within a car-length behind Kieckbusch's car. (Gov't's Br. at 3; Def.'s Br. at 2.)

Traveling with Kieckbusch in his vehicle was an African-American male named "Herman." Herman weighs approximately 300 pounds and is over six feet tall. By contrast, Kieckbusch is five feet eight inches tall and weighs approximately 130 pounds. (Def.'s Br. at 2.)

The parties have different versions of what transpired after Officer Bohlen stopped his vehicle behind Kieckbusch's car.

According to Officers Bohlen and Bell, they could see Kieckbusch through the back tinted window of his vehicle. Both officers testified that, as Officer Bohlen exited his vehicle from the driver's side and Officer Bell exited from the passenger's side, they observed Kieckbusch turn his entire body to the right, between his vehicle's bucket seats, and reach or lunge with both arms into

3

the backseat. Officer Bohlen testified that he estimated Kieckbusch was turned around in this fashion for around five to ten seconds. Officer Bell testified that he estimated Kieckbusch was turned around in this fashion for around three to five seconds. Officer Bohlen testified that he did not see Kieckbusch pull down the back seat, nor did he see Kieckbusch put anything in the trunk. (Gov't's Br. at 3; Def.'s Br. at 2.)

In contrast to the above, Kieckbusch testified that he did not reach into the backseat of his vehicle at any time. Instead, Kieckbusch testified that, after stopping his vehicle, he looked to the left as the officers approached his vehicle. (Gov't's Br. at 3; Def.'s Br. at 3.)

Officer Bell testified that, in approaching Kieckbusch's vehicle, he had begun opening his passenger door before the squad car had come to a full stop and had prepared himself to jump out and give chase in the event that anyone fled. Officer Bell stated that he did this in response to Kieckbusch's actions in driving his vehicle and as a result of the overall circumstances surrounding the stop. Officer Bell also testified that he drew his gun and kept it down by his side in light of Kieckbusch's movement towards the backseat. Specifically, Officer Bell testified that, at the time, he was concerned that there was a weapon in Kieckbusch's car. Similarly, Officer Bohlen testified that he put his hand on his gun, ready to draw, due to his concerns over Kieckbusch's movement. (Gov't's Br. at 3-4.)

Officer Bohlen then ordered Kieckbusch and Herman to put their hands where he could see them. Both men complied. Officer Bohlen then approached Kieckbusch on the driver's side of the car as Officer Bell approached the passenger side. Officer Bohlen stated that Kieckbusch had shut off the car and had his driver's side window open. Officer Bohlen further stated that he recognized

4

Kieckbusch as a member of the Latin Kings street gang based upon Officer Bohlen's prior viewing of photographs of Latin King gang members and the tattoos on Kieckbusch's forearms.

Upon Officer Bohlen's request, Kieckbusch gave Officer Bohlen his driver's license and informed Officer Bohlen that he (Kieckbusch) was the owner of the car. Officer Bohlen stated that, during this time, Kieckbusch was excessively nervous. Officer Bohlen stated that Kieckbusch's hands were shaking and his eyes darted from side to side. Oficer Bohlen testified that he was concerned that, based upon Kieckbusch's nervousness, Kieckbusch was experiencing a "fight or flight" reaction and was possibly going to re-start his vehicle and flee. (Gov't's Br. at 4.)

Based on the totality of the circumstances, and specifically given the officers' concern about weapons, Officers Bohlen and Bell asked Kieckbusch and the passenger to exit the vehicle, patted them down, and had them sit on the curb behind Kieckbusch's car. Kieckbusch stated that when he exited the vehicle, he placed his keys and cell phone on the hood of the car. By contrast, Officer Bohlen stated that Kieckbusch's keys were still in the ignition of the vehicle during his search. Neither Kieckbusch nor Herman were handcuffed immediately following their exit from the vehicle.

The parties again offer different versions of the events following Kieckbusch's placement on the curb.

According to Kieckbusch, Officer Bohlen searched Kieckbusch's vehicle for approximately 15 minutes. Kieckbusch testified that Officer Bohlen then told Officer Bell that the car was "clean," at which time Officer Bell asked Officer Bohlen if he (Officer Bohlen) had searched the trunk. Kieckbusch testified that his car was completely clean save for a few documents in the glove compartment. Kieckbusch stated that Officer Bohlen then used Kieckbusch's keys to open the trunk. According to Kieckbusch, it was at this time that Officer Bohlen first discovered a sawed-off

shotgun, snugly wrapped in a pink and white towel, which was located in the area of the trunk closest to the rear of the vehicle. Additionally, Officer Bohlen discovered a shopping bag lying on its side that contained fireworks. This bag was in the trunk area close to the backseat. (Def.'s Br. at 3.)

According to Officer Bohlen, after Kieckbusch was placed on the curb, he (Officer Bohlen) searched Kieckbusch's vehicle and immediately noticed that the car was completely clean, void of any trash or objects. Officer Bohlen testified that, in light of Kieckbusch's movements in the backseat of the vehicle at the outset of the stop, he was concerned when he found the backseat of the vehicle empty. Specifically, Officer Bohlen stated that he believed Kieckbusch's movements may have been related to the presence of a weapon in the vehicle. Officer Bohlen stated that the following considerations also made him nervous that there was a weapon in Kieckbusch's vehicle: (1) Kieckbusch's driving and acceleration away from the police; (2) Kieckbusch's proximity to the previous evening's shooting on 15th and Becher Street; (3) Kieckbusch's suspected gang affiliation; and, (4) Kieckbusch's excessive nervousness during the stop. (Gov't Br. at 4-5.)

Officer Bohlen testified that during his search of the passenger compartment in Kieckbusch's car, he noticed a cloth handle on the backseat. From the front seat, reaching into the back, Officer Bohlen pulled the handle on the backseat, and the backseat folded down flush to the back of the front seat. Officer Bohlen testified that it was at this time that he discovered the aforementioned bag of fireworks and a striped bath towel. Officer Bohlen stated that he reached at least three to four feet into the trunk area to the towel. Officer Bohlen further stated that upon touching the towel, he felt what he believed to be a trigger-guard of a firearm inside the towel. Officer Bohlen testified that he then took the keys from the ignition, opened the trunk from the back of the car and retrieved a sawed-off shotgun from inside the towel. (Gov't Br. at 5.)

6

After Officer Bohlen retrieved the gun from Kieckbusch's vehicle, Kieckbusch was placed under arrest. Kieckbusch had at least two prior felony convictions for possession of firearm as a felon and armed robbery. Kieckbusch was not issued any traffic citations in light of the instant, more serious charges. (Gov't's Br. at 5-6; Def.'s Br. at 3.)

### III. DISCUSSION

The parties agree that the overriding issue in this case is whether Officer Bohlen's search of Kieckbusch's trunk compartment falls within the permissible confines of the Fourth Amendment. However, the parties disagree as to the standards under which Officer Bohlen's search of Kieckbusch's trunk should be evaluated. As such, this court's initial task is to determine the appropriate Fourth Amendment rubric for determining whether Officer Bohlen's search was constitutionally permissible.

The defendant asserts that Officer Bohlen's search of Kieckbusch's trunk was permissible so long as Officer Bohlen had probable cause to believe that Kieckbusch's vehicle contained contraband. A warrantless search of a vehicle, as occurred in the instant case, is permissible so long as an officer has probable cause to believe that the vehicle contains contraband or evidence. *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996) (citing *Carroll v. United States*, 267 U.S. 132, 153-56, 45 S. Ct. 280, 69 L. Ed. 543 (1925)). A lawful automobile search extends to all parts of the vehicle where contraband or evidence could be concealed, including the trunk. *Id.* Probable cause exists for such a search if, under the totality of the circumstances, it is fairly probable that the car contains contraband or evidence. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The defendant contends that Officer Bohlen's search was permissible only if the court finds that Officer Bohlen possessed such probable cause. (Def.'s Br. at 4.)

7

By contrast, the government contends that Officer Bohlen's search of Kieckbusch's trunk was constitutionally permissible under the Fourth Amendment so long as Officer Bohlen can demonstrate that he had a reasonable suspicion upon which to conclude that such search was necessary for his protection or for the protection of others nearby. The government notes that the Supreme Court recognizes that "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding the suspect." (Gov't's Br. at 1 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)).) The Seventh Circuit, in *United States v. Arnold,* elaborated on the *Long* holding by stating that "[a]n officer with a reasonable suspicion that a motorist may be armed and may be able to gain immediate control of weapons may conduct a protective search of the passenger compartment of the vehicle without a warrant." 388 F.3d 237, 239 (7th Cir. 2004). The officer's belief in such an instance must be based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably support that belief. *Long*, 463 U.S. at 1049. "In other words, the legality of such a search depends on 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Evans*, 994 F.2d 317, 320 (7th Cir. 1993) (quoting *Long*, 463 U.S. at 1050). In evaluating whether an officer had a reasonable suspicion to conduct a protective search, courts must consider the totality of the circumstances, and must give due weight to reasonable inferences officers are entitled to draw from the facts, in light of their experience. *Id.* Accordingly, the government contends that this court's task is to determine whether Officer Bohlen was reasonably justified in believing that there was a weapon in Kieckbusch's vehicle. (Gov't's Br. at 7.)

8

While the defendant is correct that an officer may conduct a warrantless search of a vehicle if such officer possesses probable cause to believe that the vehicle contains contraband or evidence, an officer is also permitted to take steps necessary to protect the officer's safety and the safety of others. Stated another way, if Officer Bohlen can demonstrate that he possessed a reasonable suspicion that Kieckbusch's car contained a weapon that was immediately accessible by Kieckbusch, then Officer Bohlen was constitutionally permitted to conduct a protective sweep of Kieckbusch's vehicle. In the event that Officer Bohlen is unable to demonstrate that he possessed such a reasonable suspicion, then the defendant is correct that Officer Bohlen would be required to demonstrate that he possessed probable cause to believe that Kieckbusch's vehicle contained contraband or evidence. Because, as discussed below, I am persuaded that Officer Bohlen did possess a reasonable suspicion to believe that Kieckbusch's vehicle contained a weapon, I need not address whether Officer Bohlen also possessed probable cause for such a search.

The defendant asserts, and I agree, that this court's task is to decide whether Kieckbusch made certain movements which justified Officer Bohlen's search of Kieckbusch's trunk. Accordingly, this court must determine whether (1) Kieckbusch made a movement towards the back of his car as Officers Bohlen and Bell approached the vehicle; and, (2) whether such movement together with other circumstances justified Officer Bohlen's search of the trunk.

The defendant contends that because there is no conceivable reason that Kieckbusch would have lunged towards the backseat of his vehicle, Kieckbusch's version of events is more credible than Officers Bohlen and Bell's version of events. Specifically, Kieckbusch invites this court to ascertain the possible motives that Kieckbusch may or may not have had in reaching into the backseat of his vehicle. The defendant notes that Officer Bohlen did not see the defendant pull the

9

backseat down or put anything in the trunk. The defendant further notes that the backseat of Kieckbusch's vehicle was clean. As such, the defendant argues that the officers' version of events is illogical. Moreover, the defendant asserts that the officers' version of events is a fabrication of events tailored to justify Officer Bohlen's illegal search of Kieckbusch's trunk. In conclusion, the defendant contends that the officers used illegal means to obtain the desired end – the recovery of a sawed-off shotgun from Kieckbusch's trunk – in violation of Kieckbusch's Fourth Amendment rights.

Despite the defendant's best efforts to demonstrate otherwise, I am satisfied that Officers Bell and Bohlen were credible when they testified that they observed Kieckbusch reach or lunge into the backseat as the officers approached his vehicle. In regards to the defendant's assertions about the officers' motives to fabricate their testimony, this court notes that it could similarly speculate as to the defendant's possible motives for testifying that he made no such movement. Indeed, the defendant has much to gain if the court were to suppress the gun as evidence.

Although each officer was sequestered during the course of the other's testimony, Officer Bohlen's recollection of events corroborated Officer Bell's recollection and vice versa. Furthermore, as the government notes, if the officers were motivated to lie, then it would have made intuitive sense for them to claim that they saw Kieckbusch put something into or take something out of the trunk, thereby bolstering their case. But they did not so testify. In sum, I am satisfied that Officers Bell and Bohlen were truthful when they testified that they observed Kieckbusch reach or lunge into the backseat as they were approaching his vehicle.

Additionally, I am not persuaded by the defendant's attempt to discredit the officers' version of events as "illogical." To be sure, it does not appear that Kieckbusch was on the brink of grabbing

10

the sawed-off shotgun when the officers observed him reach into the backseat. However, this is not to say that Kieckbusch did not have any motives for reaching into the backseat. Perhaps Kieckbusch was confused about whether he had placed the gun in the backseat or in the trunk and was attempting to confirm that the weapon was not in the backseat. Or, perhaps Kieckbusch was attempting to grab the gun in the trunk area, but Officer Bohlen's instruction to place his hands in the air forced Kieckbusch to abort his attempt. Accordingly, while the parties can speculate as to any number of possible motivations behind Kieckbusch's actions, I am nevertheless convinced that the officers' recollection of events is not discredited by the defendant's argument that their recollection is "illogical."

In light of the foregoing, I am satisfied that the government has demonstrated that Officer Bohlen possessed a reasonable suspicion that there was a weapon in Kieckbusch's car. In coming to this conclusion, I note that Officer Bohlen stated that the following circumstances constituted the factual basis for his reasonable suspicion that Kieckbusch's car contained a weapon: (1) the defendant's proximity to the Latin King shootings the night before; (2) the defendant's membership in the Latin Kings as demonstrated by Officer Bohlen's recognition of the defendant from previous photographs and the identifiable gang tattoos on the defendant's arm; (3) the defendant's erratic driving; (4) the defendant's extreme nervousness; and, (5) the defendant's movement towards the backseat as the officers approached his vehicle. Based on the above, I am satisfied that a reasonably prudent man in Officer Bohlen's shoes would have felt that a protective search of Kieckbusch's vehicle was necessary to ensure the safety of Officer Bohlen and others nearby.

This court's final task is to determine whether Officer Bohlen exceeded the scope of his constitutionally permissible search when he lowered the backseat of Kieckbusch's car to examine

11

the trunk area. In examining this issue, I note that the Seventh Circuit in *Arnold* addressed a factual situation very similar to the instant case. Specifically, the facts in *Arnold* involved a police officer who, during the course of a traffic stop, had observed the driver of the vehicle reach toward the backseat and then move back to the driver's seat as the officer was approaching the car. As a result of the defendant's movement and other suspicious circumstances, the officer in *Arnold* conducted a protective sweep of the vehicle. In the course of his protective sweep, the officer pulled down a backseat middle armrest. The officer knew that the armrest opened directly into the trunk. In the trunk space behind the armrest the officer discovered a loaded handgun. The defendant challenged the officer's search behind the armrest as beyond the permissible scope of the protective sweep. *Arnold*, 388 F.3d at 238-39.

In rejecting the defendant's motion, the Seventh Circuit in *Arnold* determined that the officer's protective sweep was properly focused on the areas immediately accessible to the driver while he was there, a protective sweep that included the trunk of the vehicle. 388 F.2d at 240. The court in *Arnold* began its analysis by recognizing that a protective search must be confined to "'those areas in which a weapon may be placed or hidden.'" *Id.* at 239 (quoting *Long*, 463 U.S. at 1049). The court went on to address the very issue in this case: whether a trunk that is readily accessible from the backseat of a vehicle is within the scope of a protective search. In rejecting the defendant's arguments that the trunk was not within scope of a protective search, the court in *Arnold* stated that "[a]lthough no court seems to have addressed the specific problem of a trunk that is readily accessible from inside the passenger compartment, we see no reason to distinguish this accessible area from any other." Because the officer in *Arnold* had a reasonable suspicion that the defendant

12

may have retrieved or concealed a weapon in the trunk area based on his unusual movements, the court determined that a protective sweep of the trunk area was permissible under *Long*. *Id.* at 240.

Similar to the facts in *Arnold*, the trunk area in Kieckbusch's car was immediately accessible to someone reaching into the backseat of the car from the driver's seat. Specifically, Officer Bohlen stated that he was able to grab the cloth strap on the backseat of Kieckbusch's vehicle from the front seat. Additionally, that the officers observed Kieckbusch reaching into his backseat, considered in conjunction with the undisputed evidence that his backseat was otherwise empty, is evidence that Kieckbusch was attempting to access the trunk area from the front driver's seat. As a result, I am satisfied that the trunk area in Kieckbusch's vehicle was immediately accessible to Kieckbusch as he reached into the backseat.

In light of the foregoing, I am satisfied that Officer Bohlen's search of Kieckbusch's trunk via the backseat was within the scope of his permissible protective sweep of the vehicle. As noted above, both officers observed Kieckbusch reach into the backseat as the officers approached his vehicle. Moreover, Kieckbusch's movement, in conjunction with his nervousness, gang affiliation, and proximity to a gang shooting the night before, gave the officers a reasonable suspicion to believe that a weapon was in Kieckbusch's vehicle, possibly in the backseat or trunk area. Indeed, for all that the officers knew, Kieckbusch could have resumed his attempt to reach into the trunk area via the backseat to grab a weapon once their traffic stop had concluded, thereby exposing the officers to grave personal danger. As a result, because I am convinced that the trunk area was immediately accessible to Kieckbusch via a cloth strap on the backseat of his vehicle, I am similarly convinced that a search of Kieckbusch's trunk area was within the scope of a protective sweep under *Long* and *Arnold*. Thus, it will be recommended that the defendant's motion to suppress be denied.

13

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress be **DENIED**;

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) - (C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 24th day of December, 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge